Good morning, your honors. It's a privilege and an honor to appear before you today. My name is Steven Volker. I represent plaintiff and appellant Save Strawberry Canyon. We're here today because very profound issues of public health and safety were swept under the rug by the Department of Energy with the result that the public was kept in the dark with regard to the serious potential of the subject laser acceleration project to expose both workers and the public to dangerous levels of radiation due to a number of factors that are present in this case. We explained in our opening brief that this is an unusual context in which residences are within two blocks, a children's science museum is within three blocks, the project site sits on an unstable steep slope which is recognized by the state of California as posing a landslide hazard, it is within 1,600 feet of the Hayward Fault, considered to be the Bay Area's most dangerous earthquake fault zone, and it is in a wildfire hazard area, most notably the 1991 wildfire that reached into Claremont Canyon is just one ridge south of this spot. Having resided in the next ridge myself and having had to evacuate because of that 1991 wildfire, I can attest that there is broad public concern in the surrounding neighborhoods that this is not an appropriate site for a facility which could release dangerous levels of radiation. Instead of preparing an EIS as required by NEPA, and I'll get into why it would be required, the government prepared an environmental assessment. An environmental assessment is, according to some courts, a quick and dirty means of ascertaining whether a project poses a significant effect on the environment. The standard in this Ninth Circuit under North American wild sheep is whether a project may have a significant effect on the environment. It's a very low threshold. The threshold is met here because if one examines the factors under the NEPA guidelines set forth in 40 CFR section 1508.27, one finds at least six factors indicating that the intensity of the proposed project's impacts on the public are such that an EIS should be prepared. That section of the guidelines first examines the context, which I have explained is an unusual situation in which a very powerful laser accelerator deemed to be one of the most powerful in the world that would generate the equivalent of one petawatt or 10 billion volts of electricity in a pulse. It's a very short pulse, but it's a pulse that is so powerful it is equal to 960 times the electrical generating output of the United States. Because of the severe stress created by this enormous pulse of energy on the receiving end, like a Linscombe fastball, you have... Or what used to be his fastball. He came back in form last night or the night before, as I recall, Your Honor, yes. But anyway, in this case we have a context where the so-called beam dump is exposed to enormous radiation that generates neutrons and muons and other technical terms for radioactive materials that are shielded by the government's own admission by layers of lead, steel, concrete, even redundant layers of concrete. Why is that? It's not because this is a mere 40-watt light bulb, as opposing counsel has suggested in briefing to the court, but rather one of the Earth's most powerful sources of energy. And it's like a Faustian bargain. With the energy you also have the potential for contamination. This is a site by the government's own admission that has released radiation in the past because it has other more modest accelerators on site. The cumulative effect of all of these accelerators working in unison has not been examined. Instead, we are told that the addition of this most powerful one would not add anything to the calculus of the hazard posed to the public. Now, once we have established the context, which is one of acute sensitivity of the public to the potential impacts of this project, then the guidelines direct that we examine the intensity factors. And we have here at play a number of factors that really should go without dispute. First, there's a controversy. Under 1508.27b.4, there were many, many letters from the public throughout this approval process pointing out that this was a very dangerous project and that we needed to proceed cautiously with a full EIS, examining alternate sites, examining the potential for significant impacts on the public. We have the public health and safety impacts noted under subdivision B.2 of that regulation. As I've explained, they can be extreme due to the potential for release if there's an earthquake, if there is a breach in the containment because the concrete foundation surrounding this might be cracking because over time, with frequent earthquakes, we would have the release of radiation and earthquakes, of course, don't give any warning. They just happen. And when they happen, there's no time to shut systems down or take action that's appropriate to minimize harm to the public. Rather, you have a split second where everyone's diving for cover under the nearest desk or door frame. And in that split second, you could have the beam going in the direction where it shouldn't and radiation being released. We have, in the final moments of the briefing, in this case, the government has come up with the musings of one of the scientists with the Department of Energy indicating that, in fact, they admitted that there could be an impingement in the direction of the laser beam and that the beam could continue to operate, notwithstanding that, i.e., the anticipated structure of containment might not be positioned at that moment to contain the release of dangerous radiation. Yet, there's no disclosure in the EA, as I will explain shortly. We have unique characteristics under subdivision B3. We have unique and unknown risks, unique risks due to the wildfire, the seismicity, the fact that this sits on unconsolidated sediment within a collapsed volcano or caldera, and, of course, the landslide risks admitted by the government as encompassing most of Building 71 where this project would be situated. We have unknown risks because this is, according to the government, at or beyond the state of art for such a facility. It's one of the most powerful in the world. We're only told frequently that there are multiple examples of this somewhere in the world, but not told where they are, how powerful they are, whether they're sited miles from any inhabited structures, and so forth. This is a precedent-setting situation in that the citizens of the surrounding residential areas within Berkeley are concerned that this is yet another accelerator placed in a very hazardous location that would continue to expose the public to hazards, and yet nothing is done. We have the cumulative significance of this additional accelerator along with the others on site and the past releases of radiation. So we have at least six of the factors under the CEQ regulations for identifying when an EIS should be done are present, and for that reason an EIS should have been done because this project most notably is capable of releasing radiation under circumstances which cannot be controlled due to a landslide, earthquake, or fire in an environment where residences in a children's science museum are nearby. Now, the government contends that it addressed all these issues in the EA, but when one examines the EA that was prepared here, one doesn't find the answers to these questions. Instead, one finds an agency deep in denial, a denial that extends to the point where the agency characterized many of these impacts as simply issues determined not to warrant further discussion. For example, the accidental release of radiation, the single most obvious impact of this project, was deemed not to warrant further discussion. The EA's discussion of radiation impacts assumes without explication that unstated regulatory limits would protect the public from any untoward results, but this is precisely what NEPA is designed to move away from. NEPA is designed to generate an informed public discourse where an agency comes clean about the potential impacts, expands its horizons with regard to the kinds of alternatives and mitigation measures that would address the heretofore unacknowledged impacts of a project, and where the public can actually make a genuine contribution to the dialogue by advising the public, my goodness, here we have Berkeley, many PhDs in fields that are relevant, including geology, seismicity, we're available to assist the government in moving toward a more informed decision making, but there was no response. There were dozens of requests for more information on seismicity, on alternate locations, on the radiation emitted by this project, but stonewalling in response, there were... I don't know stonewalling, I mean the response is, look, these problems were aware, we've identified, you talk about earthquake risk, identify precisely where the faults are, you talk about seismic proofing building 71, much as this building has presumably been seismic proofed. That's not uncommon, unusual, unheard of. Why isn't that an answer? Look, it's not going to be a problem because the building has been sufficiently strengthened to withstand the forces that could be expected. If that's true, then what's wrong? Yes, well, there are a number of things that are wrong with that. First of all, when the public asks, for example, what about the National Academy of Sciences report indicating that there is no level of safe exposure to radiation, please advise us as to what levels the public would be exposed to. No, no, no, stop, stop. See, because what I've been concerned about, I had a hard time pinning down the objections because your response presumes release of radiation, and what the EAA says is that we don't have that problem. This is a known science. We know what radiation risks are. The building has been built in such a way as to contain the radiation problem, the threat of earthquakes or seismics. So I ask you about seismic conditions, and you respond assuming there's going to be a release of radiation. How can you do that? Because the point of it is that there's not going to be a release of radiation. Now, you can object to that, but you can't respond to the question, well, why should we be concerned about the release of radiation by saying radiation might get released? That's not a response. So what's wrong with the EAA with regard to the seismic conditions? It doesn't say anything about accidental release of radiation. Well, stop then, stop again, because the objection you brought to the table is there's a fault line. Okay, the EAA talks about that. The EAA gives its response, and your response to me is there could still be a release of radiation. Why, a black hole is going to come swallow the building? I mean, you've got to give me some reason to tell me why there's going to be this release of radiation that produces all the concerns you identify. Because what the EAA says is that there's not going to be that release, and unless there's something wrong with that, where else do we have to go? The EAA leaps from one conclusory mention to another. Exactly what you've done. So tell me what's wrong with it. Dig into the conclusions. Don't tell me that this conclusion is wrong and then jump to something else. Well, I believe that the burden falls on the government in a NEPA process to explain to an apprehensive citizenry that the government has considered all the questions that have been raised. In this case, hard questions were raised, but in many cases, as we've explained in our briefs, the government did not respond to the specific issue raised. Why should we assume that radiation is going to be released? That seems to be the premise of your argument. I would suggest that we have many examples in this country. One reason could be an accident, right? Operator error. Deliberate sabotage. Now, we had a brief discussion of intentional acts of destruction in the EAA. That was assuming that the source of the destruction would be someone from the outside who would attempt to break in as opposed to someone, as we had recently in the case of the anthrax scare on the East Coast, who actually was a certified, highly trained and skilled official within the government who had a nervous breakdown or decided to part company with reality in some odd way or decided to have an opportunity to make a statement of some kind. We have no discussion of internal sources of intentional acts of sabotage. That's an example. And when you have a facility sited in such a hazardous area where an earthquake could upset any engineering that is suggested because you have the potential for surface displacement of an earthquake fault capable of unleashing the power sufficient to move buildings off their foundations, it doesn't follow that merely repeating endlessly the mantra that the building will be engineered safe addresses the issue. Furthermore, Your Honor, questions were asked about what about alternate sites. Aren't there places that aren't so close to residences and children's museums and so forth? And there was silence, only two responses. One, we need a big perimeter around it. And two, there are no vacant accelerator facilities available. Well, this one is going to be so reengineered with new cladding, it doesn't strike me that some other industrial scale facility could likewise be clad in this way and provide the requisite safety. Moreover, we were told in another location in the EA responses that actually a wide perimeter around the building is not needed. So there was really no reason not to look at alternative sites. That was not done. I think I'm out of time, Your Honor. Assuming you want to save the balance for rebuttal. Yes, I do. Thank you. May it please the Court, my name is Alan Brabender with the Department of Justice, and I represent the Department of Energy and Secretary Chu. First and foremost, let me address this argument that NEPA required the Department of Energy to prepare an environmental impact statement, or EIS, for the Berkeley Lab Laser Accelerator, or BELA. As this Court knows, NEPA only requires an environmental impact statement to be prepared if the proposed action may have significant environmental impacts. And the only impact that plaintiff even alleges may be significant is the potential radiation impacts. But the Department's EA here convincingly explains why BELA will not have significant radiation impacts. Who has to be convinced? I mean, obviously the plaintiffs haven't been, so you tell us it's convincing. What exactly is the standard? Who makes the judgment as to what's satisfactory? Well, first and foremost, the agency makes the determination that it's satisfactory. And then this Court reviews under the APA for whether that is an arbitrary or a capricious determination. And there is more than enough in this EA to show that the agency made a reasonable determination. Tab 3 of the excerpts of record contains the EA, and pages 103 and 104 contain the primary radiation analyses. And you'll see at page 103 the Department says that BELA shielding will be built so that a full time worker standing right next to the beam dump, which is the highest point of radiation exposure, will be exposed to a little less than 20 percent of the radiation allowed by regulatory safety limits. Well, that's assuming, you know, everything works the way it should. But my problem here is that I don't see anywhere in the EA where it addresses, you know, this possibility that the plaintiff's been talking about, which is an accidental radiation release. It really doesn't address that at all. No, Your Honor, the EA does address that at page 246. And what the Department says is that BELA cannot produce radiation in the event of an accident or in the event of an earthquake or landslide. And that is because, as we explained in our brief, in order for BELA to function, its equipment needs to be precisely aligned down to the micrometer. Any accident, earthquake, landslide, or some other scenario would cause misalignment and would not allow BELA to function. It would not be allowed to produce the electron beam, and it would not be able to produce radiation. Again, that's addressed at page 246 of the EA, among other places in the record. Is that a reference to the DOE, the number that's stamped in the corner? I mean, I went through all these. I'm not a scientist. I didn't understand most of what I was looking at. So if you could point me to exactly what it is you were referring to, it might be helpful. Yes, and it's tab 3 of the excerpts of record. It's DOE number 246. Okay. That appears to be a table where there are responses to comments. Is that correct? That's correct. That is part of the EA. And which comment and which response is it I should pay most attention to? Your Honor, I don't have that document right in front of me. But what it says is Bella cannot function in the event of a disturbance event, I believe is what it says. Well, I see something. The accelerator would produce radiation only during normal operation. It would shut down and stop producing radiation during a disruptive event, e.g. that caused ground shaking or power disruption. I guess the concern is, because earthquakes aren't predicted, and suppose you're in the midst of operation and the earthquake hits. Bella shuts down, but does that mean the radiation that's being created when it was operating has suddenly dissipated? Here's where my lack of scientific knowledge leaves me adrift, because if I have any sense that, well, there's radiation and there's a breach in the structure, that's the source of concern. Now, it may be from DOE's perspective this is a concern as a non-scientist concern, but I'm a non-scientist, so I can understand the concern. So tell me why it is that I shouldn't be concerned that this sudden breach isn't going to cause the release of radiation. Well, I am not a scientist either, Your Honor. But how I understand Bella to work is the laser is focused on the particle accelerator portion of Bella. The laser is shot into the particle accelerator, which is a tube about this big, the size of a light bulb, a fluorescent light bulb, and an electron beam is created. It's that electron beam that, when it terminates, radiation is released. So if that tube isn't aligned with the laser and it requires, again, precise alignment, then no electron beam can be produced and there can be no radiation produced. So the event of what would happen in an earthquake is there would be a very discrete release of radiation, which would be absorbed by the shield, and then Bella would not produce any more radiation after that point. That is what the Department is talking about at page 246. Now, going back to the EA, the EA notes that a full-time worker would be exposed to a little less than 20 percent of the regulatory safety limit. The regulatory safety limit is 5 rem for a trained radiation worker, and so that means a full-time worker would be exposed to about 1 rem. The EA then goes on to note that because radiation diminishes by a factor of 4 as distance from the source doubles, there is no foreseeable risk that the regulatory safety limit for the general public will be exceeded. That is the... Let me understand that because I think Save Strawberry Canyon argues that your calculation about the amount of radiation that a worker at Bella would face is really kind of irrelevant in determining whether the public would be exposed to too much radiation because the regulatory limits for workers are 50 times higher than for the public. What's your response to that? The response is in the EA itself. The EA says radiation will diminish by a factor of 4 as distance from the source doubles. That's a concept known as inverse square law, and when you apply inverse square law principles based on the information contained in the EA, and contained in the EA is the notion of inverse square law, as well as the numbers, the 1 rem number for trained workers and the fact that the nearest residence is 600 feet away, when you do the calculations, it can be shown that the radiation impact on the nearest residence is 0.00028 rem, or 28,100,000th of a rem. That is 360 times less than the regulatory safety limit for the general public, which is 0.1 rem, and this is not a post hoc rationalization as council tries to spin it. It is the Department of Energy that chose to state the radiation impacts to the general public in terms of inverse square law. All council, all I'm doing is plugging in the numbers based on the method and the numbers provided by the Department of Energy and the EA. To put this number in perspective, the average annual background radiation in the United States is 0.3 rem, over 1,000 times greater than the amount of radiation attributable to Bella on the nearest residence. Jet travel exposes people to 0.005 rem per hour of travel, such that a coast-to-coast trip, round trip, exposes someone to an equivalent amount of radiation as living next to Bella for 15 years. I was exposed to far more radiation flying from Washington, D.C., to San Francisco for this argument than someone living next to Bella would be exposed to for years. Even living in a brick house exposes someone to more radiation than is attributable to. That could be that could be why you're losing your hair like I am. I started losing my hair long before. You let me ask you something I understand a little bit about because I have no idea what you've been talking about. Way over my head. But you recently filed a 28 day letter. Right. About these regulations and incorporated by reference. Does that mean you agree with the district court's analysis? In fact, the E.A. does incorporate these other documents by reference. Are you contesting that? No, I don't think that's what the district court held. My understanding is that district court found that these were not examples of incorporation by reference, but were mere citations. Well, what's your position now? Well, our position is that this E.A. does not incorporate anything by reference. It was not the department did not intend to incorporate any. Well, this is just sort of like, you know, protective backstop. This means 28 to 28 day later. No, you're saying that's your position. But if we conclude otherwise, it's still permissible practice. That's correct. And this issue, I should also know, has been forfeited since the plaintiff did not write the department to this issue. Now, Bella's impacts are insignificant, both individually and cumulatively with other projects at the lab. The E.A. states at page 132 that because each each accelerator is independently shielded, the amount of radiation or the radiation exposure from operating all of the accelerators at the same time would be indistinguishable from operating them separately. In other words, the department has an extensive radiation monitoring program at at the Berkeley lab. And the radiation monitors at the lab boundaries have consistently and continually registered zero. And that is because the amount of radiation emitting from the lab is so low, it is undetectable by modern radiation equipment. And the department predicts that once Bella is added, the monitors and the radiation detection devices will continue to read zero. Now, for the most part, plaintiffs in their reply brief at least abandoned the argument that an E.I.S. needed to be prepared. They render it very back of their reply brief and essentially a paragraph and instead nitpick at the E.A. But an E.A. is supposed to be a concise document with only brief discussions of environmental impacts. And this comprehensive and detailed E.A. more than meets the minimum standards. The E.A. discloses the radiation impacts on the public in a public friendly manner that is easily understood by the average person. Again, it notes that the radiation impact to trained workers is one rem. And it goes on to say that due to inverse score law principles, there is no foreseeable risk of the regulatory safety limit for the general public being exceeded. That the amount of radiation emitting from Bella is so low, it will be undetectable by modern detection equipment at the lab property boundaries. I mean, the premise of that discussion is all things operating the way they're expected to operate. And the specter that hangs over this and many of these cases is the what if something truly unexpected happens. And it's obvious. We just went through the centennial of the Titanic. Sometimes people's plans don't kind of work out. You can't base all your decisions on the possibility of disaster. But I think that's the case that's been presented to us here. What if there is an earthquake? What is if there is a landslide? What if you have a breach in the radiation protection system for this, and possibly an accumulated basis for other things happening within the laboratory? What's the government's response to that what if? The documents are always intended to be forward-looking documents. And they're always stated in terms of predictions and anticipations. It is the department's prediction, and it believes it's a reliable prediction, of course, that Bella will not be able to function in the event of an earthquake or some other accident scenario. That determination is not arbitrary. It's not capricious. And it should be upheld. Moreover, the department also designed its shielding to take into account the fact that there might be such an accidental release. And it designed its shielding accordingly. That analysis can be found at page 55 and 56 of our supplemental excerpts of record. Now, regarding these other issues, the non-radiation issues, we believe they have been forfeited because plaintiffs did not raise them to the agency at the appropriate time. The plaintiffs do not dispute that they did not raise these issues, but they state that they may nevertheless raise them because others did. But others did not make the exact same arguments being made now to this Court. General references to items such as hazardous waste or seismic issues does not preserve a claim to any and all issues even remotely related to those topics. It is the plaintiff's burden to show that the same argument, or at least a substantially similar argument that is being made to this Court, was made to the agency during the administrative proceedings. And we do not believe that the plaintiffs have done that here. But in any event, the E.A. is sufficient to comply with the law. The Department considered the potential for accidents and determined that Bella could not function in the result of an accident. The E.A. considers the potential for sabotage. But what about the e-mail from, I guess, is it Ms. Abbott, to Ms. Abbott, from Jeff? It's dated Monday, June 15, 2009. Are you familiar with that, the accident e-mail? Probably. Based on that description, I am not, though. Oh, it says, Kim Abbott wrote, Jeff, I talked to Gary and we agree that the E.A. does not do a very good job of accident analysis. The type, so accidents type at LBNL would be earthquake, wild, land fire, and slides. We agree at this point not to revise the E.A. If the public comments on the lack of accident analysis, we can provide analysis in response to the comment. Right. So that was an internal e-mail commenting on the draft E.A., not the final E.A. But in the final E.A., the Department did, in fact, include analysis on wildfires and landslides at pages 99 and 100 of the excerpts of record. And it did, with response to accidents, provide its explanation there at page, again, 246 of the excerpts of record. So those issues identified by Mr. Abbott were addressed in the final E.A. Now, plaintiff has raised a number of issues, and I am not exactly sure where to concentrate. If this Court has any additional questions for me regarding any of the other issues that the plaintiffs have raised, I would be happy to answer them. Okay. Thank you, Your Honor. I would ask you to uphold the judgment below. Thank you. Rebuttal. Thank you, Your Honor. We just heard that the government had adequately addressed the potential of this facility to release radiation. Actually, the record tells a different tale. On August 26, 2009, this is just 10 days before the release of the final E.A. and the finding of no significant impact, we find that an expert within the Department of Energy, admitting that the shielding calculations had not been done. This is found at ER tab 8, page 306. And, of course, they didn't appear in the E.A. They still haven't been calculated. The problem with this case is that every time you look for a definitive answer, you find vagueness or no answer at all. Another example is we're told that page 346 at tab 3 of the E.R. explains that if there is a slight jarring or misalignment of the linear accelerator, that we won't have any release of radiation. But it doesn't say that. It doesn't even mention the word misalignment. We're told that the E.R. provides a formula whereby anyone in the public can deduce the release that they would be exposed to based on their distance from the E.A. But the E.A. has no such information. There is no quantification of radiation exposure for members of the public. This is simply something that popped out of counsel's brief. The relevant part of the E.R. is at tab 3, pages 103, 104. And, again, not only were those not divulged to the public, but even as we speak today, we have no information indicating that final radiation calculations have been performed by the government. Then we're told that the E.A. explains that there would be no measurable radiation at the project boundary. But if you look at the relevant citation, tab 3, page 132, it doesn't say anything like that. It just says it is anticipated that no measurable radiation will be detected at the boundary without explaining what levels would be generated and under what circumstances. Under this circuit's authority, including the most notably Blue Mountains, anticipated simply doesn't cut NEPA mustard. There has to be an explanation and a more definitive analysis of why it is that levels that would be generated would pose no health risks. I've already acknowledged I'm a non-scientist, so I've struggled through much of this. I understand the true thrust of your case to be based upon what I'll call a breach scenario. That is that the radiation containment system does not work. Some of the arguments you've made go beyond that, and some of the things you've just said suggest something beyond that. But is that correct? Is it the containment system that we should be most focused on? I believe so, Your Honor. There's no foolproof system, whether you're looking at Three Mile Island, Fukushima, Deepwater Horizon, or the Titanic. When an engineer says, this can't fail, I know there's going to be a problem. And that's the purpose of having an EA explain the context, explain the science, so that the lay public can be informed and they can write their congressman or they can write to the head of the Department of Energy and say, wait a minute. This happened at this location under these similar circumstances. Couldn't it repeat here? Please advance your understanding and show us that you know it can't happen and why. That simply never happened. Instead, we are told that safety will be addressed in the future. We have the two key safety documents, the safety analysis document, aptly called the SAD document, and the acceleration safety envelope, both to be developed in the future. But the future is today. This project has been approved. Where are those documents? They haven't been developed. Those are critical under the government's own assessment to ascertain the levels that people would be exposed to and what cladding or shielding or site clearing would be necessary to protect them. And with that, thank you very much, Your Honor. Thank you. The case just argued is submitted. We thank both counsel for the argument. That concludes the argument calendar for today. We will be back in a few minutes to speak to some of our visitors, and it's a public courtroom. Others are welcome to stay, but I'll assure you and tell the students the one strict rule in these discussions is we don't talk about the cases just argued. So sticking around doesn't help you learn anything about what just happened. We won't be talking about that. With that, we are adjourned.
judges: Tashima, Clifton, Murguia